UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Clearview Software
International, Inc. and
Blue Ivy Solutions, Inc.

    v.                            Civil No. 07-cv-405-JL
                                           Opinion No. 2011 DNH 139
Christopher E. Ware

**OPINION & ORDER**

The question in this business tort case is whether defendant Christopher Ware, an employee of Symbol Technologies Inc., can be held liable to plaintiffs Clearview Software International, Inc. and Blue Ivy Solutions, Inc., two authorized resellers of Symbol's products, for helping a company with which they had been working, Blue Ivy Mobility Solutions, LLC, also become an authorized reseller and then compete with them for customer business. Plaintiffs have asserted claims against Ware for (1) unfair and deceptive business practices, including allegedly "passing off" Blue Ivy Mobility as Blue Ivy Solutions; (2) tortious interference with their contractual relations with a customer, Stop & Shop Supermarkets; and (3) a civil conspiracy with Blue Ivy Mobility and several of its employees. This court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity), because plaintiffs are both New Hampshire companies, Ware is a Massachusetts citizen, and the amount in controversy exceeds $75,000.

Ware has moved for summary judgment, see Fed. R. Civ. P. 56, arguing that there is no evidence that he engaged in any unfair, deceptive, or otherwise tortious conduct.[1]  He has also moved to strike much of the evidence that plaintiffs submitted in opposition to summary judgment, arguing that it is inadmissible hearsay.  See Fed. R. Evid. 801, 802.  After hearing oral argument and reviewing the summary judgment record, this court agrees that much of plaintiffs' evidence, including their evidence that Ware "passed off" Blue Ivy Mobility as Blue Ivy Solutions, is inadmissible hearsay and thus cannot be considered for its truth.  Without that evidence (or, for that matter, even with it), plaintiffs cannot sustain any of their claims.  This court warned the parties in the scheduling order that compliance with Rule 56's requirements "regarding evidentiary support for factual assertions . . . will be required."  Document no. 35, at 2.  Because plaintiffs have not complied with those requirements, Ware is entitled to summary judgment.

---

[1]Ware also argues that the plaintiffs released their claims against him in a settlement agreement that resolved their parallel state-court lawsuits against Blue Ivy Mobility Solutions and various other defendants.  See document no. 40.  But during a separate oral argument that this court held on that issue, plaintiffs identified a provision in the settlement agreement that expressly contemplated that this lawsuit against Ware would continue.  Id. at ¶ 7.  So, as a matter of plain meaning, the settlement agreement cannot reasonably be construed as releasing their claims against him.

## I.   __Applicable legal standard__

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial.  See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010) (citing Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009)).  A fact is "material" if it could sway the outcome under applicable law. Id. (citing Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  In analyzing a summary judgment motion, the court must "view[] all facts and draw[] all reasonable inferences in the light most favorable to the non-moving party." Id.  But the court need not credit "conclusory allegations, improbable inferences, or unsupported speculation." Meuser, 564 F.3d at 515 (quotation omitted).

Where, as here, "the moving party avers an absence of evidence to support the non-moving party's case, the non-moving party must offer definite, competent evidence to rebut the motion." Id.  Plaintiffs argue that they are "not required to present evidence that is presently admissible or admissible at trial" and are "not required to present the evidence . . . that they intend to rely on to prove their claims."  But our court of

appeals has repeatedly ruled otherwise.  "In opposing a motion
for summary judgment, a plaintiff must proffer admissible
evidence that could be accepted by a rational trier of fact as
sufficient to establish the necessary proposition." Gomez-
Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 662 n.3 (1st
Cir. 2010) (emphases added); see also Fed. R. Civ. P. 56(c)(2)
("A party may object that the material cited to support or
dispute a fact [on summary judgment] cannot be presented in
admissible form.").

It is true that some forms of evidence, such as affidavits
and declarations, may be considered on summary judgment, even if
they would not be admissible at trial, so long as they "set out
facts that would be admissible in evidence" if the affiant or
declarant testified to them at trial. Fed. R. Civ. P. 56(c)(4).
Here, though, plaintiffs are relying primarily on emails written
by third parties who have not given sworn statements or been
deposed.  To the extent that those emails are being offered to
prove the truth of the matters asserted in them, they are
inadmissible hearsay. See Fed. R. Evid. 801, 802.  "It is black-
letter law that hearsay evidence cannot be considered on summary
judgment for the truth of the matter asserted." Hannon v. Beard,
645 F.3d 45, 49 (1st Cir. 2011) (quotation omitted); see also,

e.g., Gomez-Gonzalez, 626 F.3d at 666 (applying that rule to unsworn email).[2]

Plaintiffs have not argued that they need more "time to obtain affidavits or declarations or to take discovery" before responding to the summary judgment motion. Fed. R. Civ. P. 56(d); see also Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 282 n.7 (1st Cir. 2006) (such an argument is waived where, as here, plaintiffs "oppose summary judgment without filing a [Rule 56(d)] motion"). Nor would they have any reasonable basis for doing so. This case has been pending for four years, and the summary judgment motion was not filed until after the close of discovery. So plaintiffs had plenty of time to procure affidavits, take depositions of the email's authors, or take other steps to develop admissible evidence in support of their claims. They also had plenty of notice that admissible evidence would be required. In a scheduling order issued two years ago, this court warned the parties that compliance with Rule 56's requirements "regarding evidentiary support for factual assertions . . . will be required." Document no. 35, at 2.

---

[2]Nevertheless, for the sake of completeness, this court will make note of such evidence in the factual summary below.

## II.  Background

Plaintiffs Clearview Software and Blue Ivy Solutions ("Solutions") are authorized resellers of wireless, handheld bar code scanners and other computing devices manufactured by Symbol Technologies, now part of the telecommunications company Motorola Solutions, Inc.  Clearview was founded by Richard Lowney, and Solutions was founded by his son Shawn.  Both companies operate from the same location in New Boston, New Hampshire.  During the early 2000s, Clearview developed a software program called Transforming Enterprise Applications ("TEA") that, when combined with Symbol's bar code scanners, could be used to upgrade the old scanning technology that many large retailers were using. Solutions was an authorized distributor of that software.

Because plaintiffs were not experts on Symbol hardware, they engaged Richard Valarioti, an expert recommended by Symbol, to serve as their consultant, in exchange for sales commissions. Valarioti, in turn, created his own company, Blue Ivy Mobility Solutions ("Mobility").  Plaintiffs initially objected to that name, because it was so similar to Blue Ivy Solutions, but withdrew their objection after Valarioti assured them that Mobility would be a dormant entity used solely to process his commission checks.  Nevertheless, Valarioti soon hired a former

6

Symbol salesperson, Mark Barnes, to work for Mobility and assist in selling plaintiffs' products.

One of plaintiffs' customers, beginning in 2004, was Stop & Shop Supermarkets, a grocery chain in the northeastern United States that was seeking to upgrade the bar code scanning technology in its nearly 600 stores.  In 2005, plaintiffs began developing new TEA software applications specifically for the grocery chain.  Barnes, who had worked with Stop & Shop while at Symbol, helped them with the sales effort.  Plaintiffs successfully demonstrated the software applications to Stop & Shop in early 2006.  To make their sales pitch more attractive, Symbol agreed to give plaintiffs a special price discount (known as a "price exception") on its hardware, on top of the discount to which they were already entitled by virtue of having attained "premier" status as authorized resellers.

Plaintiffs were planning to fill Stop & Shop's orders through ScanSource, the largest Symbol distributor in the eastern United States and the only one with sufficient inventory to meet Stop & Shop's needs.  Plaintiffs had worked with ScanSource in the past and had received sufficient credit approval from ScanSource to place orders of that magnitude.  All of the

companies involved in the supply chain--Symbol as hardware
manufacturer, ScanSource as hardware distributor, and plaintiffs
as hardware resellers and software developers--were in position
to reap significant profits from the Stop & Shop deal if it
happened.

As plaintiffs pushed to complete the deal, however, an
unlikely competitor emerged:  Mobility.  Two of plaintiffs' key
employees working on the deal--Gary Bowser, the president of
Solutions, and Adam Knowlton, the Clearview software technician
who had developed the TEA software applications for Stop & Shop--
suddenly resigned in April 2006 and joined Mobility.  Knowlton
took the software applications and source code with him.
Mobility then set out to (1) become an authorized reseller of
Symbol products, (2) obtain the same price discount from Symbol
as plaintiffs--i.e., both the "premier" reseller discount and the
"price exception," (3) obtain credit approval from ScanSource,
and (4) persuade Stop & Shop to place its order through Mobility,
rather than plaintiffs.

Shortly before leaving Solutions, Bowser met in March 2006
with defendant Christopher Ware, who was Symbol's channel account
manager in New England, and his supervisor Kathy English.  Ware's
list of topics for the meeting began with the "migration to New
Blue Ivy."  According to Ware, Bowser had not yet told them of

any plans to join Mobility; rather, Bowser told them that Solutions was struggling financially and that he was seeking to purchase the company and turn it around.[3]  At the meeting, Bowser explained the relationship between Solutions and Mobility and expressed concern that, with Solutions so vulnerable, Mobility might apply to become an authorized reseller of Symbol products and try to take the Stop & Shop business for itself.  He asked if Ware would be able to quash such an application.  Ware responded that he was not involved in Symbol's application review process and had no ability to influence it.[4]

---

[3]The record includes a letter dated March 15, 2006 in which Bowser offered to purchase Solutions.

[4]Another topic on Ware's list for the meeting was how to "secure pipeline for 2007."  Shortly after the meeting, Bowser sent Ware an email summarizing Solutions' business pipeline, i.e., pending deals and opportunities, including the potential Stop & Shop deal.  Ware claims that he used that information only for Symbol's inventory and other planning purposes (not to benefit Mobility).  Plaintiffs have not offered any evidence to the contrary.

As it turned out, Bowser himself submitted a reseller application to Symbol on behalf of Mobility in late March 2006.[5] In an internal email notifying various Symbol employees (including Ware) of that application, English reported that Bowser had "'bought out' his partners" and "acquired Blue Ivy Solutions outright" and that his new company, Mobility, "will replace Blue Ivy Solutions as a reseller."  Ware called English the next day to clarify that, so far as he knew, no such acquisition had occurred, and Mobility and Solutions remained separate entities (as Bowser had explained to them at the earlier meeting).  Ware did not, however, contact the other Symbol personnel who had received his supervisor's email to correct her misstatement.

Bowser informed Ware in early April 2006 that he was leaving Solutions to join Mobility, which Ware recalls as an "abrupt change of plans from what he had been telling me up to that point."  According to an internal ScanSource email, Ware then

---

[5]Plaintiffs argue that, in light of that application, Ware's account of what Bowser said at the earlier meeting "seems implausible."  But it is entirely plausible that Bowser could have changed plans after his offer to buy Solutions was rejected, or that he could have been feigning concern over Mobility's application in order to gauge how Symbol would respond if plaintiffs tried to quash it.  Plaintiffs have not provided any evidence to contradict Ware's account of the meeting (such as a differing account from one of the other attendees).

10

contacted ScanSource employee Van Thomas on April 11, stated
(falsely) that Solutions was "in the process of changing their
name" to Mobility, and expressed "concern . . . around
[ScanSource's] ability to adjust their credit terms to facilitate
this [Stop & Shop] business" through Mobility.  <u>See</u> document no.
45-12.  As explained in Part I, <u>supra</u>, however, that unsworn
description of what Ware told Thomas cannot be considered for its
truth, because it is hearsay within hearsay, <u>see</u> Fed. R. Evid.
801, 802, 805, and carries no "circumstantial guarantees of
trustworthiness" equivalent to those of any recognized hearsay
exceptions, <u>see</u> Fed. R. Evid. 807.[6]

---

[6]In an abundance of caution, this court gave plaintiffs an
opportunity, by holding a second "continuation of argument"
hearing expressly for this purpose (<u>see</u> 8/15/11 Hearing Notice)
to attempt to identify any hearsay exception that could salvage
that email (and others, including the Mike Reid email discussed
<u>infra</u>, document no. 45-24) as admissible evidence, but they were
unable to do so.  Plaintiffs argued that the emails are
admissible to show their authors' state of mind or belief about
the relationship between Mobility and Solutions, which is one of
the issues raised by the summary judgment motion.  <u>See</u> Fed. R.
Evid. 803(3).  But, even assuming <u>arguendo</u> that they are
admissible for that purpose, they still cannot be used for the
purpose of establishing that Ware made statements that gave the
sender that state of mind or belief.  <u>See</u> Fed. R. Evid. 803(3),
advisory committee notes (1972) ("The exclusion of 'statements of
. . . belief to prove the fact . . . believed' is necessary to
avoid the virtual destruction of the hearsay rule which would
otherwise result from allowing state of mind, provable by a
hearsay statement, to serve as the basis for an inference of the
happening of the event which produced the state of mind.")
(quoting Fed. R. Evid. 803(3)).

Ware arranged a meeting with Bowser and Thomas on April 19 for the purpose of introducing Mobility to ScanSource and discussing what Mobility would need to do to obtain credit approval from ScanSource for the Stop & Shop deal.  In advance of that meeting, Ware recalls explaining to Thomas the difference between Solutions and Mobility, and Bowser's move between them. According to internal ScanSource emails, which again cannot be considered for their truth because they are inadmissible hearsay, see Fed. R. Evid. 801, 802, 805 the meeting included further discussion of "the recent move by Gary [Bowser] and approximately 6 others to form" Mobility and "discussions of possibl[y] using another company for the [Stop & Shop] deal."  Documents no. 45-29 and 45-30.

Meanwhile, Ware continued to communicate with Solutions' founder, Shawn Lowney.  On April 24, Lowney informed Ware that his plan was "to move forward with a better team."  Ware told Lowney that Symbol would continue to support Solutions as an authorized reseller and that Solutions could continue to pursue the Stop & Shop deal, with its price discount.  But Lowney acknowledged that it would be difficult to do so, given the recent loss of key personnel.  Ware urged Lowney on April 25 to "get this all resolved . . . sooner not later," and said he would send the "same message" to Mobility.  Lowney reported back that

Clearview and Mobility were entering into a memorandum of understanding (later replaced by a formal agreement) that "resolves this all" and "politically postures everything so Stop N Shop and Symbol can bless the whole Kit N Caboodle."

The memorandum of understanding, dated April 25, authorized Mobility to resell Clearview's TEA software to Stop & Shop at the same price available to Solutions (but did not address who would be reselling Symbol's hardware).  Ware claims that, in light of that agreement and his communications with Lowney and the president of Clearview, he "understood that Solutions had decided not to pursue the Stop & Shop contract and that, instead, Clearview and Mobility had joined together to pursue it."  After that point, Solutions never expressed any further interest to Ware in pursuing the Stop & Shop deal.  Lowney acknowledged at his deposition that Solutions understood that Mobility was pursuing it, and "we were staying away from it for the best interest of our software deal."

On April 26, Ware notified Bowser that Mobility had been approved by Symbol as an authorized reseller, would be "protected" by the same price discount as Solutions on the Stop & Shop deal, and would attain "premier" status "as your volume goes up this year."  Ware denies, however, having any involvement in Symbol's decisions to approve Mobility's application or extend

the price discount.  Symbol "insulated" its channel account managers from that decision-making process, he says, because of their close working relationship with resellers.  Ware merely reported the results to Bowser.[7]

That same day, ScanSource received a formal credit application from Mobility.  According to internal ScanSource emails, there was considerable confusion there about whether Solutions or Mobility would be getting the Stop & Shop deal, and whether Mobility would have the same pricing structure as Solutions.  See documents no. 45-21 and 45-22.  According to those emails, ScanSource employees had separate conversations with Bowser (on behalf of Mobility) and Richard Lowney (on behalf of Solutions), each of whom believed that the Stop & Shop deal was his, leading ScanSource to suspect that the "split between the two companies is not as clean as we think" and that a "lawsuit could rear its head" if Mobility received the deal instead of Solutions.[8]

---

[7]Plaintiffs argue that Ware's reporting of those results, plus an email in which he asked Bowser to confirm Mobility's address for the application, belie his denial of involvement in the decision-making process.  But Ware's explanation--that he was merely the messenger--is consistent with the documents.  Plaintiffs have not presented any contrary evidence that Ware was involved in the decision-making.

[8]Those emails also appear to contain inadmissible hearsay, see Fed. R. Evid. 801, 802, 805, but this court need not reach

14

On May 11, 2006, Symbol employee Mike Reid--who, according to internal emails, was the person ScanSource was "going through . . . to get to the bottom of this"--provided the following assurances in an email to ScanSource:

> According to our CAM [Ware] who manages both [Solutions and Mobility], they have agreements in place as to how this separation is working and the structure around it. . . . In the separation, according to our CAM, [Mobility] is entitled to take the customer base.  As such, the expectation is now that [Mobility] will take the Stop & Shop order and place that on ScanSource.

Document no. 45-24.  Again, however, that unsworn description of what Ware told Reid cannot be considered for its truth, because it is hearsay within hearsay, see Fed. R. Evid. 801, 802, 805, 807, and carries no "circumstantial guarantees of trustworthiness" equivalent to those of any recognized hearsay exceptions, see Fed. R. Evid. 807.[9]

Reid's email also addressed the "pricing structure," explaining that it would be "the same . . . regardless of which Blue Ivy takes the deal."  Id.  Internal emails indicate that, having received those assurances from Reid, ScanSource proceeded to review Mobility's credit application, treating Mobility as a "new entity" separate from Solutions.  Document no. 45-26; see

---

that issue because they have no significant impact on the summary judgment analysis.

[9]See also note 6, supra.

<u>also</u> document no. 45-23 (stating that "Mobility has taken this deal from [Solutions]").

By mid-May 2006, Ware was telling third parties (including Jim Rapp at the company Avnet) that Mobility, not Solutions, would be getting the Stop & Shop deal.  In an effort to drum up more business, Ware forwarded to three other Symbol employees an email containing a link to "non Stop & Shop" "demo software" for Symbol's bar code scanner, saying that they "can share this demo with any interested parties or make it available to anyone within Symbol."  Richard Lowney claims that he thereafter "received a call from a Symbol employee in South Africa who informed me that he just opened the link," which contained "the demo software that was created for the Stop & Shop project."  Again, however, that employee's statement to Lowney is inadmissible hearsay and cannot be considered for its truth.  <u>See</u> Fed. R. Evid. 801, 802.  The link itself no longer exists, and there is no admissible evidence in the record from anyone who accessed or used it (except Ware, who claims that the link was to a PDF presentation that merely displayed an image of Symbol's scanner, without using plaintiffs' TEA software).

ScanSource's review of Mobility's credit application continued into June 2006.  Emails, some of which were forwarded to Ware, indicate that the review was not going well for

16

Mobility.  ScanSource had floated the idea of requiring Valarioti
to make a personal guarantee, or else having Stop & Shop issue a
joint purchase order to both Mobility and ScanSource.  In early
June, Symbol executive Pete Grimes sent an email to his
subordinates (with a copy to Ware) warning that ScanSource "is
not, under any circumstances, to talk to Stop & Shop about this,"
that "we don't understand why ScanSource can't simply work with
Blue Ivy Mobility . . . the same way they did with Blue Ivy
Solutions," and that "[i]f they refuse, we'll figure another way
to get the product from Symbol to Blue Ivy/Stop & Shop."
ScanSource ultimately approved Mobility's credit application
without the personal guarantee or joint purchase order.  Ware
denies having any influence over ScanSource's decision.

     Having made all the necessary arrangements with Symbol and
ScanSource, Mobility successfully completed the deal with Stop &
Shop in fall 2006.  It is not entirely clear from the record how
Stop & Shop came to place the order through Mobility, rather than
plaintiffs.  There is evidence, however, that Mobility sent
technical specifications to Stop & Shop with its name where
Solutions' name had been; that it sent letters to another
Solutions customer (Demoulas Super Markets) describing a "change
we had with the ownership of Blue Ivy" and asking that customer
to replace Solutions with Mobility in its vendor database; and

that Mobility insisted (in an email copied to Ware) that Symbol use the generic name "Blue Ivy" in letters confirming the price discount for the Stop & Shop deal.  So one could infer that Mobility led Stop & Shop to believe that Mobility was the same entity as Solutions.  But Ware claims, and the plaintiffs conceded at oral argument, that he had no interaction with Stop & Shop regarding that issue.

After losing the Stop & Shop deal, plaintiffs brought lawsuits in New Hampshire Superior Court against various individuals and entities allegedly involved in diverting that business away from them, including Mobility (now doing business as Optical Phusion, Inc. and/or Mobiltaneous, LLC), several of its employees (including Valorioti, Bowser, Knowlton, and Barnes), Symbol (and its parent Motorola), and Ware.  The cases generally included claims for unfair and deceptive business practices, see N.H. Rev. Stat. § 358-A et seq., tortious interference with contractual relations, and civil conspiracy. Ware, Symbol, and Motorola removed the cases against them to this court, see 28 U.S.C. § 1441, but the other cases remained in Superior Court.

Plaintiffs entered into a settlement agreement in February 2009 with all of the remaining state-court defendants, agreeing to release those defendants (and anyone "acting . . . in concert

18

with them") from liability in exchange for an undisclosed settlement payment and other consideration.  See note 1, supra. Later that year, they also voluntarily dismissed their lawsuit against Symbol and Motorola in this court without prejudice.  See Clearview Software Int'l, Inc. v. Motorola, Inc., No. 09-cv-314 (D.N.H. Nov. 24, 2009) (document no. 11).  But their lawsuit against Ware, an employee of Symbol/Motorola, was not voluntarily dismissed with the lawsuits against his employer, nor was it covered by the state-court settlement agreement.  See note 1, supra.

Ware initially moved to dismiss for lack of personal jurisdiction, see Fed. R. Civ. P. 12(b)(2), but this court denied that motion after allowing jurisdictional discovery.  See Clearview Software Int'l, Inc. v. Ware, 2008 DNH 182; oral order dated Dec. 18, 2008.  Ware then moved to dismiss for failure to state a claim.  See Fed. R. Civ. P. 12(b)(6).  In an admittedly "close call," this court concluded that plaintiffs' allegations were sufficient to state claims for (1) unfair and deceptive business practices, (2) tortious interference with their contractual relations with Stop & Shop, and (3) civil conspiracy with Mobility and several of its employees, but not for (4) misappropriation of trade secrets.  See Clearview Software Int'l, Inc. v. Ware, 2009 WL 2151017, 2009 U.S. Dist. LEXIS 60444

19

(D.N.H. July 15, 2009); margin orders dated Aug. 28 and Sept. 25, 2009.  Following discovery, Ware moved for summary judgment on all of the remaining claims.

III.  **<u>Analysis</u>**

Ware argues that he is entitled to summary judgment because plaintiffs have not presented any evidence that he engaged in unfair, deceptive, or otherwise tortious conduct.  Plaintiffs argue, in response, that "there are significant factual disputes . . . regarding the level of involvement of [Ware] in assisting Mobility" and whether his actions in that regard were tortious. As explained below, it is more accurate to say that there are significant factual <u>gaps</u> in the summary judgment record, because plaintiffs have done virtually nothing to develop their claims through discovery, despite this court's earlier warnings that the Rule 12(b)(6) motion presented a "close call" and that compliance with Rule 56's requirements "regarding evidentiary support for factual assertions . . . will be required."  <u>See</u> Part I at 5, <u>supra</u>, <u>see</u> <u>also</u> document no. 35, at 2.  Because plaintiffs have not supported their claims with admissible evidence, Ware is entitled to summary judgment.

**A.   *"Passing off"***

Plaintiffs' primary theory of liability is that Ware "passed off" Mobility as Solutions, or otherwise caused or conspired to cause confusion as to Mobility's identity and its relationship with Solutions, for the purpose of diverting the Stop & Shop business from Solutions to Mobility.  That theory, if supported by admissible evidence, could support each of plaintiffs' tort claims against Ware.  See N.H. Rev. Stat. § 358-A:2, I-III (listing "passing off" and "causing likelihood of confusion or of misunderstanding as to the source . . . of goods or services" or "as to affiliation, connection, or association with . . . another" as unfair and deceptive business practices); Demetracopoulos v. Wilson, 138 N.H. 371, 374 (1994) (noting that "fraudulent misrepresentation ordinarily constitutes 'a wrongful means of interference [with contractual relations] and makes an interference improper'") (quoting Restatement (Second) of Torts § 767, cmt. c (1977)).

Plaintiffs have not presented any admissible evidence, however, that Ware "passed off" Mobility as Solutions.  Their only evidence in that regard consists of inadmissible hearsay in an unsworn email from a ScanSource employee, which states that Ware told the employee that Solutions was "in the process of changing their name to" Mobility.  See document no. 45-12.  As

explained in Parts I and II, supra, that evidence cannot be
considered for its truth--i.e., that Ware in fact made that
statement--and without it the most that the summary judgment
record shows is that Ware knew that others were "passing off"
Mobility as Solutions or causing confusion about their
relationship.  One cannot reasonably infer from such knowledge
that Ware, too, engaged in such conduct or conspired to do so.
See, e.g., United States v. Boidi, 568 F.3d 24, 30 (1st Cir.
2009) (stating, in a criminal case, that "mere knowledge . . . is
not enough" to establish conspiracy).

Moreover, even if plaintiffs could prove that Ware "passed
off" Mobility as Solutions or conspired to do so, they still have
not presented any evidence that this conduct caused them any
harm.  As plaintiffs acknowledged at oral argument, it is clear
from the summary judgment record that both Symbol and ScanSource
understood, by the time they made their relevant decisions to
approve Mobility, that it was a separate entity from Solutions
(even if there may have been some initial confusion or
misunderstanding on that point).  So any earlier "passing off"
did not cause their decisions.  And while it is unclear whether
Stop & Shop understood the distinction between Mobility and
Solutions when it decided to place its order through Mobility,
plaintiffs have presented no evidence--admissible or not--that

Ware made or conspired to make any misrepresentations directly to Stop & Shop.

As a last resort, plaintiffs argue that Ware had an affirmative duty to correct any "passing off" by others of which he was aware (including even supervisors at his own company). "The duties of one who merely omits to act are more restricted," however, "and in general are confined to situations where there is a special relation between the actor and the other which gives rise to the duty." Coan v. N.H. Dep't of Enviro. Servs., 161 N.H. 1, 8 (2010) (quoting Restatement, supra, § 302, at cmt. a). Absent such a relationship, the "mere fact that [an] actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Id. (quoting Restatement, supra, § 314); see also, e.g., Marquay v. Eno, 139 N.H. 708, 716 (1995) ("As a general rule, a person has no affirmative duty to aid or protect another.").

Plaintiffs strive mightily to identify some "special" relationship between themselves and Ware, emphasizing their long course of dealing with Symbol and the value they added to its products by developing their TEA software. They even go so far as to argue in their summary judgment objection (albeit not in their complaint) that Symbol and Ware had a fiduciary duty to

23

them.  But plaintiffs have not cited, nor has this court found,
any authority for the proposition that a manufacturer has a
fiduciary or other "special" relationship to its resellers (much
less that an employee like Ware has such a relationship, or that
it trumps his obligations to his employer or supervisors).  See,
e.g., Franchi v. New Hampton Sch., 656 F. Supp. 2d 252, 263
(D.N.H. 2009) (explaining that, under New Hampshire law, such
relationships are "'unique' or at least 'rarely seen'") (quoting
Schneider v. Plymouth State Coll., 144 N.H. 458, 463 (1999)).
That is a commonplace business relationship governed by the
ordinary principles of tort law.

It is worth noting, moreover, that the reseller agreement
between Symbol and plaintiffs belies any suggestion of a
fiduciary or other "special" relationship.  The agreement
provides, among other things, that "Symbol ha[d] the right to
appoint other . . . resellers . . . and/or to make direct sales"
in the plaintiffs' territory "without any obligation" to them and
"without [their] prior consent" (i.e., the right to compete
directly with plaintiffs, their supposed fiduciaries), that the
agreement shall not be construed to establish a "partnership" or
"agency relationship" between the parties, that plaintiffs "shall
conduct business" as "independent contractor[s]," and that the
"relationship between the parties shall be limited to the express

24

provisions of this Agreement."  Plaintiffs' argument for a fiduciary relationship with Symbol flies in the face of that contractual limitation and, again, would not establish a fiduciary relationship with Ware personally, in any event.

### B.  *Other misrepresentations*

Plaintiffs also claim that Ware made or conspired to make other misrepresentations in connection with the Stop & Shop deal. One is that Ware allegedly misrepresented to ScanSource that the memorandum of understanding between Clearview and Mobility gave Mobility the right to take the Stop & Shop deal away from Solutions.  Again, however, the only evidence of that alleged misrepresentation consists of inadmissible hearsay in an unsworn email by a third party.  See document no. 45-24 (stating that Ware told another Symbol employee, who then told ScanSource, that Solutions had agreed that Mobility was "entitled to take the customer base," including the Stop & Shop deal).

Another alleged misrepresentation is the email in which Ware indicated to a third party, Jim Rapp at Avnet, that Mobility would be getting the Stop & Shop deal, not Solutions (before the deal had been completed).  But that was not a misrepresentation; it was an accurate prediction of what would happen, based on what Ware knew at the time.  Plaintiffs' real complaint is with the

25

events that enabled Mobility to get the Stop & Shop deal, not
with Ware's accurate prediction that it would.  Moreover, even if
the email were a misrepresentation, plaintiffs have not presented
any evidence that it had any impact on Rapp, Avnet, or others, so
their argument fails anyway for lack of causation.

      **C.**  ***Preferential treatment***

Plaintiffs' next theory of liability is that Ware induced
Symbol and ScanSource to give preferential treatment to Mobility,
enabling it to become an authorized reseller of Symbol products,
obtain the same price discount from Symbol as plaintiffs, and
obtain credit approval from ScanSource, all without having to
meet the usual requirements that had been previously satisfied by
plaintiffs.  But plaintiffs have not identified any contractual
provision that required Symbol or ScanSource to treat other
resellers the same as plaintiffs, or that prohibited Symbol or
ScanSource from exempting other resellers from their usual
requirements.

Nor have plaintiffs identified any authority for the
proposition that, absent a contractual requirement or other
evidence of improper means, it is unfair, deceptive, or otherwise
tortious for a manufacturer or distributor to give preferential
treatment to one reseller over another (much less for an employee

26

like Ware to participate in doing so).  Plaintiffs once again resort to the argument that Symbol and Ware had a fiduciary or other "special" relationship with them that prohibited favoritism toward their competitors.  But this court rejects that argument for the reasons already discussed in Part III.A, <u>supra</u>.  No fiduciary or "special" relationship existed between Symbol (much less Ware) and plaintiffs.

Moreover, even if plaintiffs could show that the decisions by Symbol and ScanSource to give preferential treatment to Mobility violated contract or tort law, and that an employee like Ware could somehow be held personally liable for his role in those decisions, they still have not presented any admissible evidence that Ware influenced or was substantively involved in the decisions (which Ware denies).  As to Symbol, the evidence shows only that Ware served as a messenger between Symbol's decisionmakers and Mobility.  As to ScanSource, the evidence shows only that Ware arranged the introduction of Mobility to ScanSource and discussed with them the process for seeking credit approval (a process that took months and ended only after pressure from a Symbol executive).  That evidence is not sufficient to show that Ware caused either entity to give Mobility preferential treatment.

### D.  *Misappropriation of Stop & Shop opportunity*

Plaintiffs' next theory of liability is that Ware helped Mobility misappropriate their exclusive opportunity to resell Symbol products to Stop & Shop and to do so with the benefit of a "price exception."  But plaintiffs have not presented any admissible evidence that they had exclusive rights to the Stop & Shop opportunity or the "price exception."  If anything, their reseller agreement with Symbol suggests the opposite:  that plaintiffs had "a non-exclusive right" to resell Symbol products within their territory, while Symbol retained "the right to appoint other . . . resellers" in the same territory "without any obligation to" plaintiffs and "without [their] prior consent." According to Ware, "[i]t was not unusual" for Symbol's authorized resellers "to compete against one another for a particular contract," and "the decision to grant the price exceptions to Solutions and Mobility . . . was consistent with Symbol's approach to its [resellers]."

Plaintiffs argue that there is a genuine dispute of material fact on this issue, because Clearview's founder Richard Lowney has attested that his understanding was that the Stop & Shop opportunity and "price exception" belonged exclusively to plaintiffs.  But Lowney's affidavit says nothing about the basis of that understanding, making it impossible to determine whether

it was based on personal knowledge or mere _ipse_ _dixit_.  See Fed.
R. Civ. P. 56(c)(4) (affidavit in support of summary judgment
"must be made on personal knowledge").  "Self-serving affidavits
that do not 'contain adequate specific factual information based
on personal knowledge' are insufficient to defeat a motion for
summary judgment." Spratt v. R.I. Dep't of Corr., 482 F.3d 33,
39 (1st Cir. 2007) (quoting Quinones v. Houser Buick, 436 F.3d
284, 290 (1st Cir. 2006)).

      At oral argument, plaintiffs conceded that Lowney's
understanding was not based on any written contract, written
policy, or specific representation by Symbol.  Instead, their
counsel suggested that Lowney's understanding was based on his
"experience" and "course of dealing" with Symbol, including in
particular that plaintiffs had invested significant resources in
pursuing the Stop & Shop opportunity, and Symbol had never given
"any indication that [it] was going to allow other [resellers] to
compete."  But that explanation appears nowhere in Lowney's
affidavit and, in any event, would be insufficient to show that
plaintiffs had an exclusive right.  Virtually all business
opportunities, whether exclusive or not, require some investment,
and Symbol had expressly indicated in the reseller agreement that
plaintiffs' right to sell its products was "non-exclusive" and
subject to competition.

Even assuming, <u>dubitante</u>, that the Stop & Shop opportunity
and "price exception" were exclusively assigned, plaintiffs have
not identified any authority for the proposition that it is
unfair, deceptive, or otherwise tortious for an employee to
induce his own employer to breach a contract with a third party
where he considers it advantageous to his employer, absent some
evidence that he used improper means.  <u>See</u>, <u>e.g.</u>, <u>Beer v.
Bennett</u>, 160 N.H. 166, 171 (2010) (statute barring unfair
business practices "does not supply a remedy for an ordinary
breach of contract"); <u>Singer Asset Fin. Co. v. Wyner</u>, 156 N.H.
468, 478 (2007) (tortious interference must be with "third party"
contract); 1A <u>Callman on Unfair Competition, Trademarks &
Monopolies</u> § 9:6, at 9-84 (4th ed. 2011) (an "employee . . . of a
corporation, acting on the corporation's behalf, cannot be liable
for interference with the corporation's contract").  The proper
remedy in such circumstances would seem to be a breach of
contract action against the employer, not a tort action against
its employee, like this one.

It is worth noting, moreover, that plaintiffs have not even
asserted a claim against Ware for tortious interference with
their contract with <u>Symbol</u>.  Their tortious interference claim
relates only to their contract with <u>Stop & Shop</u>--or, rather,
their purported contract.  As Ware notes, plaintiffs never

actually had a contract with Stop & Shop.  Plaintiffs argue that
a contract existed by virtue of "part performance," but that
performance was merely an effort to win the competition for the
Stop & Shop contract.  It was not a contract in itself.  See,
e.g., Greene v. McLeod, 156 N.H. 724, 729 (2008) (part
performance must be "in some degree evidential of the existence
of a contract and not readily explainable on any other ground").
For that reason alone, plaintiffs cannot possibly sustain their
tortious interference claim.  See, e.g., Roberts v. Gen. Motors
Corp., 138 N.H. 532, 539 (1994) (existence of contract is a
required element of such a claim).[10]

### E.  *Misappropriation of business pipeline*

Plaintiffs also claim that Ware misappropriated or conspired
to misappropriate the business pipeline that Bowser emailed to
him after their meeting in March 2006, using it to help Mobility
compete against them.  At oral argument, however, plaintiffs
clarified that the only business opportunity at issue in this
case is the Stop & Shop account, so this theory is really no
different from the one just discussed in Part III.D, supra.  In

---

[10]Plaintiffs confirmed at oral argument that they are not
pursuing any claim for tortious interference with prospective
contractual relations.

any event, as explained in note [4], _supra_, plaintiffs have not presented any evidence to contradict Ware's claim that he used that pipeline only for Symbol's inventory and other planning purposes, not to benefit Mobility.

### F.   *Misappropriation of software demo*

Plaintiffs also claim that Ware misappropriated or conspired to misappropriate their TEA software by distributing, without their permission, a link to their software demo.  That appears to be an improper attempt to revive the trade secret misappropriation claim that this court dismissed earlier in the case.  _See_ margin order dated Aug. 28, 2009.  In any event, plaintiffs have not presented any admissible evidence (and in fact conceded at oral argument that it does not know) of what that link contained.  Moreover, even assuming _arguendo_ that it contained their software demo, plaintiffs conceded at oral argument that they have not presented any evidence of how or by whom the linked software demo was used or how any such use damaged them.

### G.   *Failure to warn or disclose*

Plaintiffs' final theory of liability is that Ware failed to warn them of Mobility's competition or to disclose to them what he was doing to help Mobility.  As discussed in Part III.A,

32

supra, however, there is generally no affirmative duty under tort law to take action to protect or assist a third party, including by way of warning or disclosure.  Coan, 161 N.H. at 8. Plaintiffs once again resort to the argument that Symbol and Ware had a fiduciary or other "special" relationship that gave rise to such a duty.  But this court rejects that argument for the reasons already discussed in Part III.A, supra.  No fiduciary or "special" relationship existed between Symbol (much less Ware) and plaintiffs.

Plaintiffs also argue that warning and disclosure were required by the implied covenant of good faith and fair dealing in their reseller agreement.  But no such claim or theory appears in their complaint.  And, even if such a claim had been properly asserted, the reseller agreement was with Symbol, not Ware, and it expressly provided that Symbol could allow competition by other resellers "without any obligation" to plaintiffs (which would presumably include any obligation to disclose that competition) and "without [plaintiffs'] prior consent."  The implied covenant of good faith and fair dealing cannot be used to "rewrite" the parties' contract.  Livingston v. 18 Mile Point Drive, Ltd., 158 N.H. 619, 623-24 (2009) (citation omitted).

Moreover, even if Ware had a duty to warn and disclose, plaintiffs have not explained how his failure to discharge that

33

duty caused them to lose the Stop & Shop deal.  While plaintiffs may not have known precisely how Mobility was obtaining the Symbol and ScanSource approvals necessary to compete for the Stop & Shop deal, or what role Ware was playing in that effort, plaintiffs knew that Mobility was pursuing the Stop & Shop deal and, according to Solutions' founder Shawn Lowney, they "were staying away from it for the best interest of our software deal." Nothing in the record suggests that plaintiffs would have taken a different approach if they had known the precise details of Mobility's competition and Ware's role in it.  So plaintiffs have not shown that Ware's failure to warn or disclose caused their damages.

## IV.  Conclusion

For the reasons set forth above, Ware's motion for summary judgment[11] is GRANTED.  His motions to strike certain summary judgment exhibits[12] are GRANTED in part to the extent reflected in this order and otherwise DENIED as moot.  The clerk shall enter judgment accordingly and close the case.

---

[11]Document no. 38.

[12]Documents no. 47 and 55.

34

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  September 9, 2011

cc:  Steven M. Latici, Esq.
     Daniel E. Will, Esq.
     Jonathan M. Shirley, Esq.